**HDI GLOBAL SE, Plaintiff,**

v.

**LEXINGTON INSURANCE COMPANY, Defendant.**

No. 16 Civ. 7241 (CM)

United States District Court, S.D. New York.

Signed February 7, 2017

Eric Jay Goldberg, Littleton, Joyce, Ughetta, Park & Kelly, L.L.P., New York, NY, Robert Laurent Joyce, Littleton Joyce Ughetta Park & Kelly LLP, Purchase, NY, for Plaintiff.

Cecilia Froelich Moss, Peter R. Chaffetz, Karen Christine Baswell, Chaffetz Lindsey LLP, New York, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO STAY AND COMPEL ARBITRATION

McMahon, Chief Judge.:

On September 16, 2016, Plaintiff HDI Global SE ("Plaintiff" or "HDI") brought this action, seeking, *inter alia*, a declaration that a reinsurance contract entered into between it and Defendant Lexington Insurance Company ("Defendant" or "Lexington") is void for lack of mutual assent. Plaintiff also seeks an order staying arbitration until the Court rules on the validity of the reinsurance contract. (Dkt. No. 1.) Plaintiff later filed an amended complaint on November 22, 2016, seeking the same relief. (Dkt. No. 19.)

Before the Court is Defendant's motion to stay the lawsuit and compel arbitration, pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3. (Dkt. No. 22.)

For the reasons set forth below, Defendant's motion is GRANTED.

### Background

### I. The Parties

HDI is a European insurance company organized in accordance with European Union law. (Am. Compl. ¶ 3, Dkt. No. 19.) HDI's principal place of business is Germany. (*Id.*) The reinsurance contract at issue was underwritten by Gerling Konzern Allgemeine Versicherung AG ("Gerling"). HDI–Gerling Industrie Versicherung AG became the legal successor to Gerling in September 2006, and was renamed HDI Global SE. (*Id.*)

Lexington is a Delaware insurance company and maintains its principal place of business in Massachusetts. (*Id.* ¶ 4.)

### II. Nature of the Dispute

#### 1. The HDI/Lexington Reinsurance Policy

In or about September 2000, Lexington began discussions with the Central Puget Sound Regional Transit Authority ("Sound Transit") to underwrite a professional liability policy for Sound Transit's design and construction of a light rail system in Washington State (the "Light Rail Project"). (*Id.* ¶ 7.) In connection with the Light Rail Project, Lexington sought reinsurance coverage from various reinsurers, including HDI, for the proposed Sound Transit professional liability policy. (*Id.* ¶¶ 9–12.)

In or about November 2000, Lexington sent HDI a reinsurance certificate for the Sound Transit risk (the "Reinsurance Policy"). (*Id.* ¶ 34; *see* Reinsurance Policy, Am. Compl. Ex. C, Dkt. No. 19–3.)

Under the Reinsurance Policy, HDI agreed to reinsure 50% of a loss to Lexington on the layer $20 million excess of $30 million. (Reinsurance Policy at 2–3.) HDI signed and stamped the Reinsurance Policy on November 3, 2000. (*Id.* at 8.)

The Reinsurance Policy refers to the underlying policy form as the "Original Policy Form LEX CM PL 7," which HDI claims includes a "negligence trigger." (*Id.* at 2; *see* Am. Compl. ¶ 35.) Form LEX CM PL 7 specifies that the policy applies

to "actual or alleged *negligent* acts, errors or omissions arising out of professional services rendered for others by the insured or any entity for whom the Insured is legally liable." (Form LEX CM PL 7, Am. Compl. Ex. F at 5, Dkt. No. 19–6 (emphasis added).) HDI allegedly learned through its own investigation that Lexington did not issue that policy—Form LEX CM PL 7—to Sound Transit, but instead issued the "2002 Sound Transit Policy" described below, which lacked a negligence trigger.

The Reinsurance Policy contains an arbitration clause, which provides that, "All disputes or differences arising out of the *interpretation of this Certificate* shall be submitted to the decision of two arbitrators, one to be chosen by each party, and in the event of the arbitrators failing to agree, to the decision of an umpire to be chosen by the arbitrators." (Reinsurance Policy at 5 (emphasis added).)

**2. The 2002 Sound Transit Policy**

On or about December 28, 2001, Lexington's agent, Western Risk Specialist, sent Sound Transit's agent Marsh USA Inc. ("Marsh") what purported to be the final Sound Transit policy ("2001 Policy Version"). (Am. Compl. ¶ 37; *see* 2001 Policy Version, Am. Compl. Ex. D, Dkt. No. 19–4.) Marsh forwarded the 2001 Policy Version to Sound Transit on January 4, 2002. (Am. Compl. ¶ 38.) The 2001 Policy Version covered "actual or alleged acts, errors or omissions caused by *Professional Negligence* in the performance of Professional Services rendered for others as designated in Item 7 of the Declarations." (2001 Policy Version at 1 (emphasis added); Am. Compl. ¶ 39.) HDI claims that "to the extent that Sound Transit sought indemnity for a loss under the 2001 Policy Version, it would have to establish that the loss arose from its subcontractors' professional *negli-*

*gence* in order to trigger Lexington's indemnity obligation." (Am. Compl. ¶ 40.)

On or about March 4, 2002, Lexington sent Marsh the operative version of the Sound Transit policy, the "2002 Sound Transit Policy;" this version allegedly removed the word "negligent" from the policy's granting clause and extended the coverage period from 2006 to 2009. (*Id.* ¶ 41; *see* 2002 Sound Transit Policy, Am. Compl. Ex. E, Dkt. No. 19–5.) The 2002 Sound Transit Policy is entitled, "Designers & Constructors Project Specific—Protech Professional Liability and Pollution Liability Policy for a Specified Project," Policy No. 6477217, with limits of $50 million per claim or occurrence and $50 million in the aggregate. (*Id.*) It covered the period from January 1, 2001 to January 1, 2009. (2002 Sound Transit Policy at 1.) The 2002 Sound Transit Policy provides: "This policy applies to actual or alleged acts, errors or omissions arising out of Professional Services rendered for others as designated in Item 8.A of the Declarations." (*Id.*; Am. Compl. ¶ 42.) Lexington "never sent HDI the [2002] Sound Transit Policy." (Am. Compl. ¶ 58.)

**3. Lexington Reports a Loss to HDI**

On September 25, 2006, Sound Transit notified Lexington of a claim by one of its subcontractors on the Light Rail Project, RCI Herzog, for cost overruns, delays, and extra work associated with the project. (*Id.* ¶ 60.) On or about June 20, 2011, RCI Herzog obtained a $66 million arbitral judgment against Sound Transit. (*Id.* ¶ 61.)

On or about April 5, 2013, Sound Transit asserted an indemnity claim against Lexington for the 2002 Sound Transit Policy's remaining limits. (*Id.* ¶ 62.) On or about February 26, 2014, Lexington wrote to Sound Transit that the 2002 Sound Transit Policy contained a negligence standard and, therefore, Sound Transit had to dem-

onstrate that the loss arose out of a Named Insured's professional negligence. (*Id.* ¶ 63.)

On May 23, 2014, Sound Transit filed a coverage action in Seattle federal court against Lexington, seeking indemnification under the 2002 Sound Transit Policy. (*Id.* ¶ 64.) For the first year of the coverage litigation, Lexington allegedly maintained that the 2002 Sound Transit Policy required proof of the Named Insured's professional negligence to trigger Lexington's indemnity obligation. (*Id.* ¶ 65.) In June 2015, Lexington conceded that the 2002 Sound Transit Policy did not contain any negligence limiting language. (*Id.* ¶ 66.) On or about August 19, 2015, Lexington and Sound Transit settled the coverage litigation. (*Id.* ¶ 67.)

On August 19, 2015, Lexington notified JLT Re of the Sound Transit settlement and asked JLT Re to send the loss notice to Price Forbes LTD for distribution to HDI. (*Id.* ¶ 68.) In response, JLT Re asked Lexington for a copy of the underlying 2002 Sound Transit Policy to send to HDI. (*Id.* ¶ 69.)

On or about September 14, 2015, Lexington sent JLT Re a document that it represented as the 2002 Sound Transit Policy—Form LEX CM PL 7, the same form referenced in the Reinsurance Policy. (*See supra* at Section II.1; Am. Compl. ¶ 70.) As discussed above, Lexington did not issue Form LEX CM PL 7 to Sound Transit; unlike Form LEX CM PL 7, the 2002 Sound Transit Policy lacks a "negligence trigger."

On December 18, 2015, HDI sent a letter to Lexington, asking for information about the Sound Transit loss to evaluate Lexington's claim. (Am. Compl. ¶ 73.) Among the "limited information" that Lexington provided HDI was a document entitled "Major Loss Report," which outlined "a brief history of the Sound Transit loss

that [was] the subject of Lexington's reinsurance claim." (*Id.* ¶ 75.) In the Major Loss Report, Lexington described Sound Transit's position in the underlying coverage litigation as follows:

> Sound Transit relied upon broad indemnity language in the policy for claims 'arising out of an act, error or omission' by the Insureds in the performance of professional services. There was no negligence/standard of care trigger in the [2002 Sound Transit] policy and WA law interprets 'arising out of' very broadly which results in significant exposure.

(Major Loss Report, Am. Compl. Ex. G, Dkt. No. 19-7.)

The Major Loss Report further reveals that the coverage litigation "warranted resolution in light of negative experiences in the coverage litigation, the broad scope of the owner's indemnification endorsement, WA law on the broad interpretation of 'arising out of,' and on burden of proof issues." (*Id.*) Lexington ultimately "resolved the matter for $27,031,240." (*Id.*)

### 4. Lexington's Arbitration Demand

On August 18, 2016, HDI received an arbitration demand from Lexington, pursuant to the Reinsurance Policy, seeking $5,423,830.76. (Am. Compl. ¶ 78.) In its arbitration demand, Lexington wrote that it "has submitted Claim No. 030–231528 to Gerling [HDI's predecessor] for payment under the Reinsurance Contract. Gerling has not paid this claim, and $5,423,830.76 is now outstanding. Accordingly, Lexington demands that Gerling arbitrate with it pursuant to the Reinsurance Contract." (Baswell Decl. Ex. A, Dkt. No. 24-1.) HDI alleges that it "only contemplated reinsuring 50% of the risk." (Am. Compl. ¶ 78.)

Following Lexington's arbitration demand, HDI brought the instant suit, arguing that it "only agreed to reinsure a

policy for Sound Transit that had a negligence-trigger for coverage" and that, because "HDI never agreed to reinsure the [2002] Sound Transit Policy [without a negligence trigger], the Reinsurance Policy is void for lack of mutual assent." (*Id.* ¶¶ 83, 86.) HDI also "requests that the Court enter an order staying arbitration until the Court determines whether the Reinsurance Policy exists." (*Id.* ¶¶ 92.)

Currently before the Court is Lexington's motion to stay this litigation and compel arbitration, pursuant to the Reinsurance Policy. (Dkt. No. 22.)

### Standard

The Federal Arbitration Act "is an expression of a 'strong federal policy favoring arbitration as an alternative means of dispute resolution.'" *Ross v. Am. Express Co.*, 547 F.3d 137, 142 (2d Cir. 2008) (quoting *Hartford Accident & Indem. Co. v. Swiss Reins. Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001)). Arbitration agreements are "valid, irrevocable, and enforceable" and are "as enforceable as other contracts, but not more so." 9 U.S.C. § 2; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967). Traditional contract defenses "such as fraud, duress, or unconscionability ... may be applied to invalidate arbitration agreements." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996).

"[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. Arbitration must be preferred unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Lapina v. Men Women N.Y. Model Mgmt.*, 86 F.Supp.3d 277, 283 (S.D.N.Y. 2015) (internal citations and quotation marks omitted).

"Section 4 of the FAA provides that a party may obtain an order directing that [an] arbitration proceed in the manner provided for in [an arbitration] agreement, and section 3 of the FAA provides for a stay of legal proceedings when the Court is satisfied that the issue is arbitrable under an arbitration agreement." *Id.* (internal citations and quotation marks omitted). "Under Section 3 of the FAA, 9 U.S.C. § 3, a district court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *Bear Stearns & Co. Inc. v. Gordon*, Nos. 08 Civ. 8596, 08 Civ. 8597, 2009 WL 1904567, at *2 (S.D.N.Y. July 1, 2009).

"In the context of motions to compel arbitration ... the Court applies a standard similar to that applicable to a motion for summary judgment." *Lapina*, 86 F.Supp.3d at 283 (citing *Murray v. UBS Sec., LLC*, No. 12 Civ. 5914, 2014 WL 285093, at *4 (S.D.N.Y. Jan. 27, 2014)). "The party seeking to stay the case in favor of arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made. Conversely, [a] party to an arbitration agreement seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Murray*, 2014 WL 285093, at *4.

"Section 4 of the FAA leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Lapina*, 86 F.Supp.3d at 283 (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)).

■ There are four factors that this Court must consider when evaluating a motion to compel arbitration:

[F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and, fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75–76 (2d Cir. 1998).

■ "If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003). However, "if the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

### Discussion

### I. Lexington's Motion to Stay the Litigation and Compel Arbitration Is Granted

■ "[R]einsurance is a contractual arrangement whereby one insurer (the ceding insurer) transfers all or a portion of the risk it underwrites pursuant to a policy or group of policies to another insurer (the reinsurer)." *Nat'l Union Fire Ins. Co. v. Am. Re–Ins. Co.*, 441 F.Supp.2d 646, 650 (S.D.N.Y. 2006) (internal citations omitted). "The scope of the risks assumed by a reinsurer depends upon the terms of the policies that are reinsured." *Id.* (internal citations omitted). "While the reinsurer is not required to pay for losses that are not covered under the underlying policy, '[a] reinsurer cannot second guess the good faith liability determinations made by its reinsured, or the reinsured's good faith decision to waive defenses to which it may be entitled.'" *Id.* (internal citations omitted).

■ On a motion to compel arbitration, a district court must determine whether there is a valid arbitration agreement, but the merits of a dispute must be left to the arbitrator. *See AT & T Tech. v. Commc'ns Workers*, 475 U.S. 643, 649–50, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (holding that "the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator"); *see also Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012); *St. Paul Fire & Marine Ins. Co. v. Courtney Enters., Inc.*, 270 F.3d 621, 624 (8th Cir. 2012) (finding that "the court may not rule on the merits of any claim the parties have agreed to arbitrate"); *Edwards v. Macy's Inc.*, No. 14 Civ. 8616, 2015 WL 4104718, at *4 (S.D.N.Y. June 30, 2015).

It is undisputed that HDI signed the Reinsurance Policy and that the Reinsurance Policy contains an arbitration clause. (*See* Reinsurance Policy at 5, 8.) HDI alleges, however, that the Reinsurance Policy is void for lack of mutual assent, because HDI never agreed to reinsure a policy for Sound Transit that lacked a "negligence trigger" for coverage. (Am. Compl. ¶ 84.) As such, HDI claims that "the existence of the Reinsurance Policy is in dispute," and that the Court should determine whether the Reinsurance Policy exists. (*Id.* ¶¶ 89, 90.)

HDI is incorrect, and the parties must proceed to arbitration under the terms of the Reinsurance Policy. HDI clearly manifested assent to the contract at issue, the Reinsurance Policy; as such, its argument

that the contract is "void" is meritless. The gravamen of HDI's amended complaint is whether the $5,423,830.76 loss cited by Lexington in its arbitration demand is covered by the terms of the Reinsurance Policy. That is strictly a matter of contract interpretation, which the parties specifically agreed to submit to arbitration. *See United Paperworkers Int'l Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 36–37, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987); *AT & T Tech*, 475 U.S. at 650, 106 S.Ct. 1415. The Reinsurance Policy covers a specific policy—"Original Policy Form LEX CM PL 7"—and includes a broad arbitration provision: *"All* disputes or differences arising out of the *interpretation* of this Certificate shall be submitted to" arbitration. (Reinsurance Policy at 2, 5 (emphasis added).) The arbitrator—not the Court—must ultimately decide whether Lexington's loss is covered by Form LEX CM PL 7, the specific policy identified in the parties' Reinsurance Policy.

HDI cannot "avoid the arbitration clause" by arguing that the Reinsurance Policy containing it is void. *See Edwards*, 2015 WL 4104718, at *4. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001). HDI's claims center exclusively on whether the Reinsurance Policy contains a negligence trigger for coverage and whether Lexington's loss falls within the terms of the contract. This dispute clearly "aris[es] out of the interpretation" of the Reinsurance Policy. *See Nitro–Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 133 S.Ct. 500, 503, 184 L.Ed.2d 328 (2012) (per curiam) (concluding that "it is a mainstay of the [FAA's] substantive law that attacks on the validity of the contract, as distinct from attacks on the validity of the arbitration clause itself, are to be resolved by the arbitrator in the first

instance, not by a federal or state court (internal quotation marks omitted)).

"[A]s ·a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract. ... [Moreover], unless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance. ... [A] challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46, 449, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006). Here, there are no allegations or facts pleaded in the amended complaint challenging the validity and enforceability of the arbitration clause itself. As such, the parties must arbitrate their dispute over the scope of reinsurance coverage under the Reinsurance Policy.

Section 2 of the FAA "states that a written provision to settle by arbitration a controversy is valid, irrevocable, and enforceable *without mention* of the validity of the contract in which it is contained. Thus, a party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitration." *Rent–A–Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 70, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010) (internal quotation marks omitted); *see also Arrigo v. Blue Fish Commodities, Inc.*, 408 Fed.Appx. 480, 482 (2d Cir. 2011); *Edwards*, 2015 WL 4104718, at *4. "As counterintuitive as it may seem ... a dispute over the making of a contract can arise out of that same contract, and thus be subject to arbitration." *Houlihan v. Offerman & Co., Inc.*, 31 F.3d 692, 695 (8th Cir. 1994). While the parties dispute whether Lexington's loss is covered by the Reinsurance Policy, this "does not render ambiguous the clear, un-

equivocal, broad and emphatic arbitration provision. Therefore, [the Court] must treat the arbitration provision as valid." *Arrigo*, 408 Fed.Appx. at 482.

As such, "*Buckeye* decisively resolves the conundrum in the case at bar in favor of the separate enforceability of arbitration provisions. Whether an arbitration agreement was made is for the Court to decide. Everything else is for the arbitrator." *Edwards*, 2015 WL 4104718, at *4. "It is the arbitrator's construction [of the contract] which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his." *See Oxford Health Plans LLC v. Sutter*, — U.S. ——, 133 S.Ct. 2064, 2070, 186 L.Ed.2d 113 (2013).

HDI argues that, because it is challenging the very existence of the Reinsurance Policy, the Court must first determine whether the contract exists. HDI's argument fails.

In *Buckeye*, the Supreme Court limited its holding to challenges to "a contract's validity" as distinguished "from the issue whether any agreement between the alleged obligor and obligee was ever *concluded*." *Buckeye*, 546 U.S. at 444 n.1, 126 S.Ct. 1204 (emphasis added). The Supreme Court's opinion "addresses only the former, and does not speak to the issue decided in the cases cited by respondents ... which hold that it is for courts to decide whether the alleged obligor ever signed the contract, whether the signor lacked authority to commit the alleged principal, and whether the signor lacked the mental capacity to assent." *Id.* Similarly, the Supreme Court's decision in *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 130 S.Ct. 2847, 177 L.Ed.2d 567 (2010), "reconfirms [the Second Circuit's] well-established precedent that where a

party challenges the very existence of the contract containing an arbitration clause, a court cannot compel arbitration without first resolving the issue of the contract's existence." *Dedon GmbH v. Janus et Cie*, 411 Fed.Appx. 361, 363 (2d Cir. 2011).

In *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58 (2d Cir. 2012), the Second Circuit addressed the jurisprudence on challenges to contracts containing arbitration clauses. The Second Circuit noted, "As the Supreme Court explained in *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006), challenges to a contract containing an arbitration clause fall into two categories: those that challenge the contract as a whole, and those that challenge the arbitration clause in particular. If the challenge is to the arbitration clause itself—an issue which goes to the making of the agreement to arbitrate—the federal court may proceed to adjudicate it." *Ipcon*, 698 F.3d at 61. The FAA "does not permit the federal court to consider claims of fraud in the inducement of the contract generally. Rather, such claims must be decided by the arbitrator." *Id.* "Nevertheless, a *limited exception* to the requirement of arbitration for general contract challenges may be available where a party 'questions ... whether a contract was ever made.'" *Id.* (emphasis added (citing *Telenor Mobile Commc'ns AS v. Storm LLC*, 584 F.3d 396, 406 n.5 (2d Cir. 2009))).

In *Ipcon*, the party seeking to avoid arbitration argued that because the other party "allegedly did not intend to perform the obligations delineated in the contracts, there was no meeting of the minds as to the contracts' key terms and thus no contracts were formed." *Id.* at 62. The Second Circuit held that this argument was "meritless," as the "contracts [were] each clear on their face as to the obligations of the

parties, and both parties duly executed the contracts, indicating that they understood their obligations. [The party seeking to avoid arbitration] [did] not allege that the parties had differing contemplations of their obligations under the contracts, or that the parties defined key terms of the contracts in differing manners. The required *objective* meeting of the minds [was] demonstrated here by the fully executed contracts." *Id.* The Second Circuit therefore concluded that the district court "correctly determined that dismissal was required in order to effectuate the contracts' arbitration clauses." *Id.*

Here, the Reinsurance Policy was clearly "concluded," and there is no issue as to its "formation." The parties entered into a valid, binding contract that is "clear on [its] face" as to the underlying policy form. *See Ipcon*, 698 F.3d at 62. The outstanding issue is whether the Reinsurance Policy— and Form LEX CM PL 7, specifically— covers a loss arising out of an entirely different policy from the one listed in the Reinsurance Policy. That question must be answered by the arbitrator as per the parties' mutually agreed-upon arbitration clause. Thus, the "limited exception to the requirement of arbitration for general contract challenges" is not applicable on the facts at bar. *See Ipcon*, 698 F.3d at 61. Lexington's motion to stay and compel arbitration is, therefore, granted.

### Conclusion

For the reasons stated above, Defendant's motion to stay and compel arbitration is GRANTED.

The Clerk of the Court is directed to remove Dkt. No. 22 from the Court's list of pending motions.