*Cooper v. Ruane Cunniff & Goldfarb Inc.*

## In the
## United States Court of Appeals
### For the Second Circuit

August Term, 2018

(Argued: February 5, 2019     Decided: March 4, 2021)

Docket No. 17-2805

CLIVE V. COOPER, individually and as a representative of a class of similarly situated plan participants, on behalf of the DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN,

*Plaintiff-Appellant,*

–v.–

RUANE CUNNIFF & GOLDFARB INC.,

*Defendant-Appellee,*

DST SYSTEMS, INC., THE ADVISORY COMMITTEE OF THE DST SYSTEMS, INC. 401(K) PROFIT SHARING PLAN, THE COMPENSATION COMMITTEE OF THE BOARD OF DIRECTORS OF DST SYSTEMS, INC., JEROME H. BAILEY, LYNN DORSEY BLEIL, GARY D. FORSEE, CHARLES E. HALDEMAN, JR., SAMUEL G. LISS, JOHN DOES, 1-20, LOWELL L. BRYAN, GREGG WM. GIVENS,

*Defendants.*

B e f o r e :

LOHIER, CARNEY, and SULLIVAN, *Circuit Judges.*

Plaintiff-Appellant Clive V. Cooper appeals from a district court order compelling arbitration of his claims for breach of fiduciary duty under § 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2). Cooper filed suit in 2016 as representative of an ERISA Plan and its participants. He alleged that Defendant-Appellee Ruane Cunniff & Goldfarb Inc. ("Ruane"), a third-party investment manager and plan administrator retained by Cooper's employer, DST Systems, Inc. ("DST"), mismanaged the assets of DST's 401(k) profit-sharing fund, causing it to lose substantial value. When he joined DST, Cooper agreed with DST to arbitrate "all legal claims arising out of or relating to employment." The district court concluded that Cooper's ERISA claims against Ruane "relate to" Cooper's employment and that Ruane, although not a signatory to the agreement to arbitrate, was entitled to rely on it to compel arbitration. On review, we conclude that the district court erred. Cooper's ERISA claims for breach of fiduciary duty are not properly understood to be "related to" his employment: none of the facts Cooper would have to prove to prevail on his claims pertain to his employment; and other individuals and entities that were never employed by DST could have brought identical claims, including other Plan beneficiaries, the Secretary of Labor, and DST itself. *See* ERISA § 502(a)(2), 28 U.S.C. § 1132(a)(2). Moreover, Congress explicitly authorized plan beneficiaries and others to sue individual fiduciaries in federal court for breach of their duties under ERISA: to interpret the Arbitration Agreement as mandating arbitration of ERISA fiduciary claims would unacceptably undercut the viability of such actions. *See Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006). That result is neither required by the Arbitration Agreement's express language nor acceptable in light of ERISA's protective purposes.

REVERSED.

Judge Sullivan dissents in a separate opinion.

———————

MONIQUE OLIVIER, Olivier Schreiber & Chao LLP, San Francisco, CA (James E. Miller, Laurie Rubinow, Shepherd, Finkelman, Miller & Shah, LLP, Chester, CT, *on the brief*), *for Plaintiff-Appellant*.

ROBERT J. WARD (Frank W. Olander, Minji Reem, *on the brief*), Schulte Roth & Zabel LLP, New York, NY, *for Defendant-Appellee*.

———————

CARNEY, *Circuit Judge*:

Plaintiff-Appellant Clive V. Cooper appeals from an August 17, 2017 order of the U.S. District Court for the Southern District of New York (Pauley, *J.*), granting the motion of Defendant-Appellee Ruane Cunniff & Goldfarb Inc. ("Ruane") to compel arbitration of Cooper's claims against it. Acting on behalf of a putative class of plan participants and an employee benefit plan, Cooper sued Ruane under § 502(a)(2) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(2), claiming damages arising from Ruane's alleged breach of fiduciary duty and mismanagement of a profit-sharing fund sponsored by Cooper's employer, DST Systems, Inc. ("DST").

When he joined DST as a software development manager, Cooper agreed with DST to arbitrate "all legal claims arising out of or relating to employment" (the "Arbitration Agreement" or "Agreement"). App'x 159. Although Ruane is not a signatory to the Arbitration Agreement, the district court concluded that Ruane can compel Cooper to arbitrate his ERISA fiduciary claims against Ruane because the claims "relat[e] to" Cooper's employment with DST and are therefore covered by the Agreement's operative clause.

On *de novo* review, we conclude that the district court erred. Cooper's claims for breach of fiduciary duty in Ruane's management of the fund are not properly understood to be "related to" his employment: the record provides an inadequate basis for finding that the parties intended the Agreement to reach profit-sharing fund related claims under ERISA. None of the facts Cooper would have to prove to prevail on his breach of fiduciary duty claims pertain to his own employment with DST; and other individuals and entities that were never employed by DST—including the Secretary of Labor and DST itself—could have brought identical claims. *See* ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2). Moreover, in § 409 of ERISA, Congress imposed liability on

3

individual fiduciaries for breach of their duties under ERISA: to interpret the generic employment related language of the Agreement as mandating arbitration of these claims would unacceptably undercut the viability and public purpose of such actions. *See Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006). Such a result is not required by the Agreement's terms and, in the absence of any such terms, we decline to construe it to conflict with ERISA's protective purposes.

We therefore REVERSE the order of the district court compelling arbitration and remand the cause for further proceedings consistent with this Opinion.

## BACKGROUND

The following account is drawn from the record before the district court when it adjudicated Ruane's motion. The facts as described here are largely undisputed by the parties; any disagreements are noted.

## I.      Factual Background

### A.      Cooper, the DST 401(k) Plan, and Ruane's role

In 1999, Cooper, an engineer and former business owner, left early retirement and began working as a software development manager at DST, an information processing and software company headquartered in Kansas City, Missouri. As a DST employee, Cooper participated in a profit-sharing plan provided by DST (the "Plan") and covered by ERISA. The Plan had two elements: a participant-directed 401(k) component, in which DST matched employee contributions; and a profit-sharing account ("PSA") component, to which only DST contributed, doing so based on a percentage of its employees' eligible wages. Plan participants (that is, all DST employees) were enrolled in the PSA when they began working for DST; they were not allowed to decline participation. Employees were also bound to keep their PSA assets in

4

the fund throughout their employment with DST; they could withdraw from their account only at the end of their employment.

Ruane, a third-party investment advisor, was engaged by DST in 1973 to manage the investment of the PSA funds. DST maintained an Advisory Committee to monitor Ruane's performance. Ruane reported periodically to the Committee. Ruane was still managing the PSA funds over two decades later, in 1999, when DST hired Cooper.

The Plan entered into a series of investment management agreements ("IMAs") with Ruane, establishing its relationship with Ruane and defining Ruane's duties and responsibilities. Subject to some limitations (that is, any investment guidelines that DST or the Plan chose to set forth in the IMAs), the IMAs provided that Ruane exercised "full authority and sole discretion" over PSA investments. *See, e.g.*, Conf. App'x 10. The discretion accorded Ruane in the IMAs made Ruane a Plan fiduciary under ERISA—a conclusion that Ruane does not dispute.[1] The IMAs contained no arbitration clause.[2]

Section 102(a) of ERISA requires covered employee benefit plans to furnish summary plan descriptions ("SPDs") of a plan's terms to participants. 29 U.S.C. § 1022(a). SPDs must be "sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." *Id.* Throughout Cooper's employment at DST, the Plan duly provided SPDs to its participants, including Cooper. Those SPDs, which from year to year during his employment were generally identical in relevant part, state:

---

[1] An individual is a "fiduciary with respect to a plan, and therefore subject to ERISA fiduciary duties, to the extent that he or she exercises any discretionary authority or discretionary control respecting management of the plan, or has any discretionary authority or discretionary responsibility in the administration of the plan." *Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996) (citation and internal quotation marks omitted); *see also infra* note 6.

[2] DST or Ruane could each terminate the relationship at any time by written notice.

> The people who operate your Plan, called "fiduciaries" of the Plan, have a duty to do so prudently and in the interest of you and other Plan participants and beneficiaries. . . . If it should happen that Plan fiduciaries misuse the Plan's money . . . you may seek assistance from the U.S. Department of Labor, or you may file suit in a federal court.

*E.g.*, App'x 569-70. The SPDs do not mention arbitration.

As a Plan participant, Cooper received notices and communications from or on behalf of the Plan. Those documents identified Ruane as the manager of the PSA assets. Among the notices he received were annual reports of DST's contributions on behalf of Plan participants and on Ruane's latest investment performance with Plan assets. Account statements updated Cooper on the performance of stocks selected by Ruane for inclusion in the PSA portfolio and disclosed Ruane's quarterly investment management fee for managing the PSA.

Cooper alleges that DST did not subject Ruane to any investment limitations from the inception of its relationship in 1973 until November 2015, when the huge losses that eventually gave rise to Cooper's complaint had already substantially occurred. As of year-end 2014, under Ruane's management, shares in Valeant Pharmaceuticals represented almost 30% of the Plan's total assets of more than $1.4 billion. By November 2015, when DST first imposed any guidance on Ruane, Valeant's stock was already in the midst of its steep decline. And by March 4, 2016, Valeant's share price had dropped dramatically, purportedly causing the value of the PSA's overall holdings to decline from a preceding 52-week high of $414.7 million to $97 million.[3] Cooper alleges that Ruane's catastrophic over-allocation of Plan assets to

---

[3] *See* Nathan Vardi and Antoine Gara, *Valeant Pharmaceuticals' Prescription for Disaster*, FORBES MAGAZINE, May 10, 2016, *available at* https://www.forbes.com/sites/nathanvardi/2016/04/13/valeant-pharmaceuticals-prescription-for-disaster/#588d61ee206c; James Surowiecki, *The Roll Up Racket*, THE NEW YORKER, Mar. 28, 2016,

Valeant shares breached its fiduciary duty to Plan participants and to the Plan generally. Accordingly, Cooper charges that Ruane is liable under ERISA for the PSA participants' losses.

B.      The Arbitration Agreement

In 2008, after he became a DST employee, Cooper received a copy of the company's "Associates' Handbook," which explains DST's employment-related policies, benefits, standards of conduct, and programs. As required, he signed an acknowledgment that he had received the Handbook. App'x 503.

The Handbook contains a section on arbitration. In relevant part, it states:

> For employment-related legal disputes that are not resolved through our Open Door Policy or Equal Employment Opportunity (EEO) Policy, the Company has implemented an arbitration program under the DST Output *Arbitration Program and Agreement* that is set forth in the Addendum to this Handbook.

*Id.* at 99. The Arbitration Program and Agreement, in turn, mandates arbitration of "all legal claims arising out of or relating to employment, application for employment, or termination of employment, except for claims specifically excluded under the terms" of the Agreement. *Id.* at 159. As claims "specifically excluded," it names four subject areas: "[1] workers' compensation benefits, [2] unemployment compensation benefits, [3] ERISA-related benefits provided under a Company sponsored benefit plan, [and,] [4] claims filed with the National Labor Relations Board." *Id.* The Agreement provides further that any arbitration under the Arbitration Program will be "administered by the

*available at* https://www.newyorker.com/magazine/2016/04/04/inside-the-valeant-scandal; Stephen Gandel, *Valeant: A Timeline of the Big Pharma Scandal*, FORTUNE MAGAZINE, Oct. 31, 2015, *available at* https://fortune.com/2015/10/31/valeant-scandal/ (describing company's reliance on untested novel drug distribution strategy).

American Arbitration Association (AAA) and conducted under the AAA's Employment Arbitration Rules." *Id.* at 156.

Cooper duly signed the Acknowledgment and Agreement Form, which cautioned that if he did not "opt out in writing within 30 days after [he] receive[d] the [Arbitration Agreement]," then he and DST "shall be considered to have agreed" to the Arbitration Agreement "as a binding contract to waive the right to judge or jury trial and to resolve employment-related legal claims under the terms [of the Agreement]." *Id.* at 162. Cooper did not opt out.

## II. Procedural History

In March 2016, Cooper filed this lawsuit naming Ruane, DST, and others (primarily DST employees) as defendants. Not long after, choosing to mediate his claims with DST and others in a private forum, he voluntarily dismissed his claims against all Defendants except Ruane.

In November 2016, after a period of discovery related to its motion, Ruane moved for an order compelling Cooper to arbitrate his claims. The following year, the district court issued an Opinion and Order compelling arbitration.

The district court's order rested on two determinations. At the threshold, the court concluded that Cooper's claims were covered by the Arbitration Agreement: they "relat[ed] to" his employment within the meaning of the Agreement, the Court held, because "the claims concern how poorly DST and Ruane managed the assets which Cooper considered to be his compensation." *Cooper v. Ruane Cunniff & Goldfarb Inc.*, No. 16-CV-1900, 2017 WL 3524682, at *4 (S.D.N.Y. Aug. 15, 2017).[4]

---

[4] Unless otherwise indicated, this Opinion omits from case law quotations any internal quotation marks, alterations, brackets, citations, and footnotes.

Having determined that the Agreement applied to Cooper's claims, the court then concluded that Ruane, although a non-signatory, was entitled under principles of equitable estoppel to enforce the Agreement against Cooper. *See, e.g., Ross v. Am. Express Co.*, 547 F.3d 137, 143-44 (2d Cir. 2008).[5] Several subsidiary findings undergirded this conclusion. First, Ruane had a sufficiently "close" relationship with DST to enable it to assert DST's arbitration rights: Ruane was DST's agent appointed as the Plan's investment manager and they maintained a longstanding relationship; and Cooper, through his receipt of regular written communications about Ruane's role as the Plan's sole investment manager, "reasonably would have known" that Ruane was "affiliated or associated" with DST. *Cooper*, 2017 WL 3524682, at *6. Second, the claims Cooper asserted against DST and Ruane substantially overlapped. *Id.* at 7. Finally, Cooper's ERISA claims and the subject matter of the Arbitration Agreement were sufficiently intertwined, the court ruled, to justify requiring Cooper to arbitrate with Ruane, reasoning that the "intertwinedness requirement," *see Ross*, 547 F.3d at 143, "is satisfied when a signatory's claims arise from the subject matter of the underlying agreement." *Cooper*, 2017 WL 3524682, at *7.

Cooper now appeals. He challenges the district court's ruling on equitable estoppel as well as its predicate determination that the Arbitration Agreement governs his claims. In the end, we need not reach the estoppel issue, because we conclude that the Agreement does not apply to Cooper's claims in the first place.

---

[5] A non-signatory who attempts to compel arbitration under an estoppel theory must demonstrate that: (1) "the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed," and (2) the "relationship among the parties [is] of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Ross*, 547 F.3d at 143-44.

## DISCUSSION

As described above, the Agreement between Cooper and DST provides that its arbitration requirement "covers all legal claims arising out of or relating to employment." App'x 159. On review, we conclude that this language does not encompass the claims for breach of fiduciary duty brought by Cooper on behalf of the Plan against Ruane under ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).[6]

It is a familiar principle that the Federal Arbitration Act ("FAA") "embod[ies] [a] national policy favoring arbitration." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228 (2d Cir. 2016) (alterations in original). Even so, the law is undisputed that "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 297 (2010) (emphasis in original); *accord Nicosia*, 834 F.3d at 229 ("[T]he FAA does not require parties to arbitrate when they have not agreed to do so."). Courts consider two factors when deciding if a dispute is arbitrable: "(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015).

In deciding a motion to compel arbitration, courts apply a "standard similar to that applicable for a motion for summary judgment." *Nicosia*, 834 F.3d at 229. Courts must "consider all relevant, admissible evidence submitted by the parties and contained

---

[6] As noted above, among the categories of claims carved out from its coverage, the Arbitration Agreement expressly disclaims coverage of actions to recover benefits under a company-sponsored benefit plan under § 502(a)(1), 29 U.S.C. § 1132(a)(1). Those claims are distinct from claims brought under section 502(a)(2), such as those that we address here. Section 502(a)(2) authorizes "the Secretary [of Labor] . . . a participant, beneficiary, or fiduciary" to bring a "civil action" for breach of fiduciary duty. A claim for benefits under § 502(a)(1), in contrast, is typically an action by an individual Plan participant or beneficiary for wrongful denial of benefits.

in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits," and must "draw all reasonable inferences in favor of the non-moving party." *Id.*

We review *de novo* the grant of a motion to compel arbitration. *Lawrence v. Sol G. Atlas Realty Co.*, 841 F.3d 81, 83 (2d Cir. 2016).

## I.      The meaning of the Agreement's phrase "relating to employment"

Section 502(a)(2) of ERISA allows lawsuits "by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief" under § 409 of the statute. 29 U.S.C. § 1132. Section 409, in turn, imposes liability on fiduciaries who breach their duties "to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary." *Id.* § 1109. The statute further makes fiduciaries that breach their duties subject to equitable relief, including removal from their position as fiduciary. *Id.* Sections 502(a)(2) and 409, read together, mean that a plaintiff suing for breach of fiduciary duty under § 502(a)(2) may seek recovery only for injury done to the wronged plan. *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008).

The question before us, then, is whether such claims for fiduciary breach—because none dispute that is what Cooper has alleged—are covered by the phrase "all legal claims arising out of or relating to employment" used in his Arbitration Agreement with DST. App'x 159. Ruane does *not* contend that Cooper's claim against it "aris[es] out of" Cooper's employment at DST, leaving the crux of the dispute located in the phrase "relating to employment."[7]

---

[7] Cooper maintains further that the IMA between DST and Ruane—not the Arbitration Agreement between DST and Cooper—governs participant lawsuits complaining about

11

The district court concluded, and Ruane urges on appeal, that Cooper's fiduciary claims "relate to" Cooper's employment at DST primarily for two reasons: first, in a "but for" causation approach, because he would not have those claims but for his employment at DST; second, because Cooper's stake in the Plan is part of his overall compensation from DST, and compensation is, of course, a feature of his employment.

Cooper counters that his claims do not "relate to" his employment at DST in any meaningful sense. He urges, looking to the text of the Arbitration Agreement, that ERISA fiduciary claims are distinct from those it identifies as subject to mandatory arbitration. The distinctness of their substance is emphasized, he contends, by the simple observation that none of the facts he would have to prove to establish his ERISA fiduciary claims (that Ruane failed as fiduciary when it overconcentrated the fund's assets) have any bearing on his employment at DST—other than the pedestrian fact that he was employed by DST and thereby became a Plan participant.

We evaluate these arguments next.

A.    Additional language in the Agreement

Both parties draw attention to language in the Arbitration Agreement in addition to the "relating to employment" phrase, arguing that the context in which that additional language appears leaves no doubt that the pivotal phrase is best read to support their respective constructions of the Agreement.

---

Ruane's management of Plan assets. As discussed, the IMA acknowledges that Ruane is a Plan fiduciary; defines Ruane's duties and responsibilities to the Plan; and contains no arbitration provision. On this basis, too, Cooper reasons that his claims are not subject to arbitration. We are not persuaded by this alternative gambit: the IMA's silence as to arbitration would not preclude DST from agreeing separately with Plan participants that their disputes as to the Plan would be arbitrated, even if those disputes implicate Ruane's obligations under the IMA.

For his part, Cooper submits that, although the Agreement describes the covered claims as "not limited to" those listed, it is nonetheless significant that, aside from the catch-all reference to "other statutory and common law claims," all the categories that *are* listed as covered are personal to the employee.[8] Thus, the text tells the reader that covered claims include, for example, wrongful discharge, discrimination, harassment, retaliatory discharge, compensation and leave disputes, defamation, and so on, as set forth more fully here in the margin. App'x 159. In keeping with the sense that the Agreement is addressing matters personal to the employee as an individual, Cooper observes that the listed categories of exclusions are similarly personal: as noted earlier, the Agreement provides that "[t]he only claims excluded [from the mandatory arbitration clause]. . . are claims by an Associate for workers' compensation benefits, unemployment compensation benefits, ERISA-related benefits provided under a Company sponsored benefit plan, or claims filed with the National Labor Relations Board." *Id.*[9] Applying the venerable canon of construction known as *ejusdem generis*—

---

[8] The relevant clause provides in its entirety:

> The claims covered by this *Arbitration Program and Agreement* include, but are not limited to, the following types of claims: wrongful discharge under statutory law or common law; employment discrimination, retaliation and sexual or other harassment based on federal, state or local statute, ordinance or governmental regulations; retaliatory discharge or other unlawful retaliatory action; overtime or other compensation disputes; leave of absence disputes; tortious conduct; defamation; violation of public policy; breach of contract; and other statutory or common law claims.

App'x 159.

[9] The relevant clause provides in its entirety:

> The only claims excluded from this Arbitration Program and Agreement are claims by an Associate for workers' compensation benefits, unemployment compensation benefits, ERISA-related benefits provided under a Company sponsored benefit plan, or claims filed with the National Labor Relations Board.

the rule that "general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words," *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001)—we are inexorably led to the conclusion, Cooper urges, that the clause should not be read to cover his fiduciary breach claims against Ruane, which he brings not on his personal account but under ERISA, on behalf of the Plan and the Plan's other participants. Cooper draws further (if more peripheral) support for his position from the Agreement's directive that any required arbitration be "conducted under AAA's Employment Arbitration Rules," App'x 156, a signal (he argues) that the Agreement speaks only to disputes between employers and employees and not to ERISA-based disputes between fiduciaries and Plan members.

Ruane, in turn, points out that the Agreement's mandatory arbitration clause covers "statutory" claims in general—a term that, it insists, must include ERISA fiduciary claims. Appellees' Br. 23-24. Ruane also reads the Agreement's express carve-out of ERISA *benefit* claims, noted above, in light of its contrasting silence regarding ERISA *fiduciary* claims, suggesting that the difference must mean that the latter are not similarly excluded.

---

Additionally, either the Associate or the Company may file a court action seeking provisional equitable remedies available under the law, including but not limited to temporary or preliminary injunctive relief, either before the commencement of or during the arbitration process, to preserve the status quo or otherwise prevent damage or loss pending final resolution of the dispute pursuant to the terms of this *Arbitration Program and Agreement*. Also, this *Arbitration Program and Agreement* does not prevent or discourage an Associate from filing and pursuing an administrative proceeding before the Equal Employment Opportunity Commission or other federal, state or local administrative agency; however, if an Associate or the Company chooses to pursue a legal claim in addition to and/or following completion of such administrative proceedings, or if there is some other legal proceeding related to the claim following completion of the administrative proceedings, the claim then shall be subject to the terms of this *Arbitration Program and Agreement*.

App'x 159-60.

Although both parties' textual interpretations have some force, we think Cooper's more persuasive in the end than Ruane's. Neither is sufficiently conclusive to resolve the issue, however, and so we proceed to analyze the operative phrase, "relating to employment."

### B. The limits of the phrase "relating to employment" in the context of an arbitration agreement

Turning our attention, then, to the phrase "relating to employment," we focus first on the limitations that we see as implicit in the phrase "relating to" in the context of an employment-based arbitration agreement.

Decisions of other circuits provide helpful insight. In particular, in *United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791 (9th Cir. 2017) ("*Welch*"), the Ninth Circuit interpreted an employee arbitration clause that expressed coverage for "any claims"—similar to that found here—as *not* covering an employee's suit under the False Claims Act ("FCA").[10] In *Welch*, a whistleblower sued her former

---

[10] Although the court there rejected the proposed mandatory arbitration of an FCA claim, the *Welch* arbitration clause was far broader on its face than DST's. As relevant here, it provided:

> I agree and acknowledge that the Company and I will utilize binding arbitration to resolve *all disputes that may arise out of the employment context.* Both the Company and I agree that *any claim*, dispute, and/*or controversy* that either I may have against the Company . . . or the Company may have against me, *arising from, related to, or having any relationship or connection whatsoever with my seeking employment by, or employment or other association with the Company* shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act . . . . To the extent permitted by applicable law, the arbitration procedures stated below shall constitute the sole and exclusive method for the resolution of *any claim* between the Company and Employee arising out of 'or related to' the employment relationship.

*United States ex rel. Welch*, 871 F.3d at 794 (final emphasis in original). In addition to the *Welch* court's ruling that FCA claims were not "related to" employment for purposes of this clause, it

employer under the FCA, alleging that the employer had presented fraudulent Medicaid claims to the government. *Id.* at 795. The Ninth Circuit affirmed the district court's denial of the employer's motion to compel arbitration, ruling that the plaintiff's FCA claims were not "related to" her employment for purposes of the relevant arbitration agreement. *Id.* at 798. The appellate court rejected the proposition that her claims must be "related to" her employment simply because she would not have been in a position to pursue those claims "but for" her employment by the defendants. *Id.* at 798-99. In support of this conclusion, the court reasoned (as Cooper does here) that the subject matter of an FCA claim does not implicate any facts particular to the plaintiff's employment. *Id.* at 799. Thus, Welch could have brought an identical FCA claim against the defendant-employer had she been a non-employee who simply stumbled into similar potentially inculpatory information about the company.

The Fifth and the Eleventh Circuits have also analyzed the meaning of employment arbitration clauses with similar "relating to" language, both of them in the context of suits seeking recovery for alleged sexual assault perpetrated by fellow employees in employer-provided residential quarters during off-duty hours. *See Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1208, 1218-20 (11th Cir. 2011); *Jones v. Halliburton Co.*, 583 F.3d 228, 230 (5th Cir. 2009). These cases also bear on Cooper's claims. The *Jones* and *Doe* courts both accepted that the sexual assault alleged in each case would not have occurred "but for" the plaintiff's employment with the defendant company, but determined nonetheless that the circumstances giving rise to the claim were outside the scope of her employment. "Relatedness" could not encompass everything that touched employment in any way, these courts posited.

---

concluded in the alternative—based on another clause in the agreement—that an FCA claim is not one that the plaintiff-employee "may have against [the defendant-employer]" because "the underlying fraud claims asserted in a FCA case belong to the government and not to the relator." *Id.* at 800.

Accordingly, in *Jones*, the Fifth Circuit observed that "'[i]f "relate to" were taken to extend to the furthest stretch of its indeterminacy,' the phrase would not have much limiting power because 'really, universally, relations stop nowhere.'" 583 F.3d at 238-39 (quoting *N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)). Similarly, in *Doe*, the Eleventh Circuit held that the phrase "related to" "marks a boundary by indicating some *direct* relationship; otherwise, the term would stretch to the horizon and beyond." 657 F.3d at 1218 (emphasis added).

To be sure, Cooper's claims are not perfectly analogous to the sexual assault cases, nor is the language in the Arbitration Agreement between Cooper and DST identical to that found in *Welch*, *Jones*, or *Doe*. Unlike those cases, something more than mere but-for causation connects Cooper's claims and his employment relationship with DST: his stake in the Plan is indeed part of his compensation at DST, as Ruane stresses, and it provides him the standing he needs to sue on behalf of the Plan. These considerations create a more substantial nexus to his employment at DST than does, as in the sexual assault cases, criminal conduct by other employees occurring outside of work hours or duties.

Nevertheless, we weigh heavily the consideration that none of the facts relevant to the merits of Cooper's claims against Ruane relates to his employment. Cooper's claims hinge entirely on the investment decisions made by Ruane; the substance of his claims has no connection to his own work performance, his evaluations, his treatment by supervisors, the amount of his compensation, the condition of his workplace, or any other fact particular to Cooper's individual experience at DST. Moreover, as pointed out in *Welch*, 871 F.3d at 799, and mentioned above, others who were never DST employees could have brought claims identical to those stated by Cooper—for example, the mismanagement claims could have been pursued by other Plan beneficiaries (such as spouses, heirs, or designees of participants); by other Plan fiduciaries, including DST

itself; and by the Secretary of Labor. *See* ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) (authorizing plan participants and beneficiaries and the Secretary of Labor to bring a civil action for breach of fiduciary duties).

We therefore agree with the approach adopted by the Ninth Circuit in *Welch* that, in the context of an employment arbitration agreement, a claim will "relate to" employment only if the merits of that claim involve facts particular to an individual plaintiff's own employment. *See Welch*, 871 F.3d at 799. Here, the merits of Cooper's claims do not involve such facts.

## II. Our adequacy-of-representation requirement regarding ERISA fiduciary claims

Although explicit language to the contrary in the Arbitration Agreement might create a different legal problem—one of enforceability—absent such plain language we observe that the reading of the Arbitration Agreement's "relating to employment" language that we adopt here would create tension with our case law governing the prerequisites applicable to plaintiffs pursuing ERISA fiduciary actions. Such a result is neither required by the Agreement's language nor desirable in light of ERISA's protective purposes. *See, e.g.*, *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (noting that "an arbitration agreement forbidding the assertion of certain statutory rights" cannot be enforced).

In *Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006), we construed ERISA § 502(a)(2) to require parties suing on behalf of a plan to demonstrate their suitability to serve as representatives of the interests of other plan stakeholders. We explained: "[T]he representative nature of the section 502(a)(2) right of action implies that plan participants must employ procedures to protect effectively the interests they purport to represent." *Id.* at 259. Citing, as examples of such procedures, class certification or joining other plan participants as parties, *id.* at 261—measures the *Coan* plaintiff,

18

fatefully, had not undertaken—we stressed that such procedural safeguards are meant to ensure that any "recovery inures to the benefit of the plan as a whole." *Id.* at 261.

The Arbitration Agreement between Cooper and DST, in contrast, requires that all arbitrated claims "be asserted, heard and resolved on a single Associate basis." App'x 158. It prohibits joinder of multiple parties and class or collective actions. *Id.* at 158-59. It is unclear, then, how, under the terms of the Agreement, an employee can bring an ERISA fiduciary claim that satisfies *Coan*'s adequacy requirement, while concurrently complying with the Agreement. If we read the Agreement to mandate arbitration for ERISA fiduciary claims such as Cooper's, a signatory seeking to bring such a claim is caught in a bind: Either she brings a claim in arbitration in some representative capacity, as our case law requires, and the claim is dismissed for violating the Agreement's prohibition on bringing claim in a representative capacity; or she brings a claim absent the required procedural safeguards, and courts in this Circuit decline to enforce any award she secures in arbitration for running afoul of *Coan*.

Looking at the same facts through a different lens, Ruane's reading of the Arbitration Agreement appears to make it impossible to bring an ERISA fiduciary action that satisfies both the Agreement and the *Coan* representative adequacy requirement, potentially rendering at least this part of the Agreement unenforceable. *Am. Express Co.*, 570 U.S. at 236. It is true that this conundrum would not necessarily justify, on its own, a countertextual reading of an arbitration agreement that explicitly

19

applied to a given circumstance. But in this case, we have already concluded that the plain meaning of "relating to" in the Agreement does not encompass Cooper's claims. To the extent the Agreement's text may permit other interpretations, we also decline to adopt an unnecessary reading that casts its enforceability into doubt, in derogation of ERISA's protective purposes.[11]

---

[11] The dissent would hold that the Agreement between Cooper and his employer covers Cooper's ERISA claims against Ruane. It would then rule that Cooper is estopped from denying that Ruane can require Cooper to arbitrate his claims. We need not reach the dissent's estoppel argument because we have determined that the Agreement does not cover these statutory claims against Ruane. Nonetheless, we note our concern about the dissent's application of arbitration-by-estoppel to Cooper.

As the dissent recognizes, consent is the foundation of arbitration: "[T]he FAA imposes certain rules of fundamental importance, including the basic precept that arbitration is a matter of consent, not coercion." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010). Allowing a non-party to enforce an arbitration agreement against a party presents an obvious challenge, then, simply because the party has not expressly consented to arbitrate disputes *with the non-party*. Yet, in certain limited circumstances, we have decided to allow it and have estopped the non-party from objecting to arbitration. We have instructed that, to justify estoppel, we must find "that the subject matter of the dispute was intertwined with the contract providing for arbitration." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 361 (2d Cir. 2008). Second, there must be "a relationship among the parties of a nature that justifies [the] conclusion" that the court should compel arbitration. *Id.* at 359. A court's consideration of whether such a relationship exists calls for a fact-specific, careful review, in which we ask whether the party "consented to extend its agreement to arbitrate to [the non-party], or, otherwise put, made it *inequitable* [for the party] to refuse." *Id.* at 361 (emphasis added).

Considered in its totality, we have difficulty seeing the specific "relationship among the parties" here—between Cooper as an employee of DST, and Ruane as a DST contractor—as one that makes it "inequitable" for Cooper to refuse to arbitrate his ERISA claims against Ruane. *Id.* Cooper's detailed knowledge of Ruane's role in and management of the Plan, or his initial view of the relationship between DST and Ruane, do not meaningfully bear on the actual *relationship* between *Cooper* and Ruane under a theory of estoppel.

More generally, we are concerned that a ruling favoring arbitration-by-estoppel in Cooper's circumstances would mark an ill-advised step away from looking to consent as the foundation of arbitration. As this case shows, such a step could have broadly restrictive effects

## CONCLUSION

We conclude that the breach of fiduciary duty claims that Cooper brought on behalf of the Plan under ERISA § 502(a)(2) do not "relate to" his employment under the terms of the Arbitration Agreement. We therefore **REVERSE** the judgment of the district court and remand the cause for further proceedings consistent with this Opinion.

---

on the rights of employees who are subject to similar agreements with their employers and who wish to press claims in court against contracting partners of their employers.

But other panels will address those claims and concerns in due course.

RICHARD J. SULLIVAN, *Circuit Judge*, dissenting:

I part ways with the majority because I am not convinced that Cooper's arbitration agreement with DST Systems, Inc. ("DST") (the "Arbitration Agreement") clearly and unambiguously excludes Cooper's breach of fiduciary duty claims from arbitration. Where, as here, an arbitration agreement uses broad language that is ambiguous about whether an issue in dispute is arbitrable, we must resolve that ambiguity in favor of arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). I would therefore affirm the district court's conclusion that Cooper's claims "relate to his employment" within the meaning of the Arbitration Agreement. *See Cooper v. Ruane Cunniff & Goldfarb Inc.*, No. 16-cv-1900 (WHP), 2017 WL 3524682, at *4 (S.D.N.Y. Aug. 15, 2017).

As a result, I would also reach the issue that the majority does not: whether Ruane Cooper & Goldfarb, Inc. ("Ruane"), "a non-signatory to the Arbitration Agreement, may compel Cooper to arbitrate his claims under the doctrine of equitable estoppel." *Id.* at *5. Admittedly, I find this question to be a closer call. Nevertheless, because of Cooper's knowledge about Ruane's role in managing the profit-sharing account ("PSA") and his characterization of DST and Ruane as closely intertwined throughout this litigation, I would also affirm the district court's equitable estoppel holding. Accordingly, I respectfully dissent.

**I.    In light of the presumption in favor of arbitrability, the Arbitration Agreement's broad language requires a finding that Cooper's claims are arbitrable.**

The Supreme Court has repeatedly instructed that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," including when "the problem at hand is the construction of the contract language itself." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25); *see First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 945 (1995); *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 & n.8 (1995); *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 475 (1989); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986); *see also Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 314 (2010) (Sotomayor, *J.*, concurring in part) ("In determining the scope of an arbitration agreement, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.  Doubts should be resolved in favor of coverage." (internal quotation marks and brackets omitted)).

2

This Court has recognized that while this interpretive rule departs from ordinary principles of contract interpretation, *see John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001), it does so for good reason: to give effect to the "liberal federal policy favoring arbitration" established by the Federal Arbitration Act, *In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 127 (2d Cir. 2011) (quoting *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24). Accordingly, the Second Circuit has frequently applied this rule to resolve questions regarding the scope of an arbitration clause in favor of arbitration, *see, e.g.*, *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 131 (2d Cir. 2015); *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 171 (2d Cir. 2004), even going so far as to explain that "federal policy requires us to construe arbitration clauses as broadly as possible," *In re Am. Express*, 672 F.3d at 128 (quoting *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 19 (2d Cir. 1995)).

Here, Cooper's breach of fiduciary duty claims fit comfortably within the broad language employed by the Arbitration Agreement. That agreement covered "all legal claims arising out of or relating to [Cooper's] employment" at DST. App'x at 159. As the majority recognizes, additional language in the Arbitration Agreement can be read to support either Cooper's position or Ruane's position,

depending on whether one relies on the interpretive canon of *ejusdem generis* or *expressio unius est eclusio alterius*. *See* Maj. Op. at 14–15. I agree with the majority that neither of these arguments, alone, "is sufficiently conclusive to resolve the issue" of whether the operative phrase "relating to employment" encompasses Cooper's breach of fiduciary duty claims. *Id.* at 15. But left with this equipoise, the majority looks to extra-Circuit case law to resolve the meaning of the agreement, whereas I would apply the binding and well-settled presumption in favor of arbitrability, which requires courts to consider whether "it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015) (quoting *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 99 (2d Cir. 1999)).

I do not think there can be any doubt that the phrase "relating to employment" is "susceptible of an interpretation that covers" Cooper's breach of fiduciary duty claims premised on his employer-funded retirement plan. *Id.* As the majority itself acknowledges, Cooper's claims have a more substantial nexus to his employment than the cases to which the majority cites dealing with sexual

4

assault.[1]  *See* Maj. Op. 17–18.  The district court properly recognized that "[t]he funds that Cooper claims Ruane mismanaged specifically originate from his employment from DST" and that Cooper himself "acknowledged that he considered DST's contributions to be a part of his compensation."  *Cooper*, 2017 WL 3524682, at *4.  Moreover, the PSA was specifically intended "to encourage [employees] to stay with [DST] until retirement," App'x at 83, evidenced by the fact that any unvested funds in the PSA at the time an employee terminated his employment "for any reason other than death, disability, or retirement" would automatically revert back to DST, *id.*  Taken together, these facts indicate that Cooper's claims – made possible by and directly pertaining to Ruane's management of his employment compensation – can reasonably be interpreted as "relating to [his] employment" at DST.  *Id.* at 159.  At the very least, Cooper has not presented evidence conclusively demonstrating that the phrase "relating to employment" excludes his breach of fiduciary duty claims, as is required to overcome the presumption in favor of arbitration.  *See, e.g.*, *Holick*, 802 F.3d at 398

---

[1] They also have a far closer relationship to his employment than the employee's claims in *United States ex rel. Welch v. My Left Foot Children's Therapy, LLC*, 871 F.3d 791 (9th Cir. 2017), to which the majority also cites, *see* Maj. Op. at 15–16.  Unlike *Welch*, in which the Ninth Circuit recognized that the plaintiff need not have been an employee to bring her claims, *see Welch*, 871 F.3d at 799, Cooper's claims here were necessarily dependent on his employment, as he would not have been in a position to bring his breach of fiduciary duty claims had he not been employed by DST and had DST not made contributions to the PSA on his behalf.

5

(finding that the presumption in favor of arbitration was overcome by evidence showing that the arbitration agreements at issue were not intended to cover claims that arose *before* the parties entered into the agreements).

In holding that Cooper's ERISA claims do not "relat[e] to" his employment, the majority relies on our decision in *Coan v. Kaufman*, 457 F.3d 250 (2d Cir. 2006), which held that to assert the type of ERISA claims Cooper brings here, a plaintiff must "take adequate steps under the circumstances properly to act in a representative capacity on behalf of the plan." *Id.* at 261 (internal quotation marks omitted). The majority reasons that, under the district court's reading of the Arbitration Agreement, *Coan*'s procedural requirement – coupled with the Arbitration Agreement's separate requirement that all arbitrated claims "be asserted, heard and resolved on a single Associate basis," App'x at 158 – appears to make it impossible for Cooper to arbitrate his ERISA claims. Maj. Op. at 19.

The problem with the majority's analysis is that the Arbitration Agreement's class-arbitration waiver is not at issue in this case. Here, we are confronted only with the question of whether Cooper's claims are "relat[ed] to" his employment. App'x at 159. Indeed, the majority concedes that the "conundrum" of reconciling the class-arbitration waiver with *Coan* "would not necessarily justify, on its own,

6

a countertextual reading of an arbitration agreement that explicitly applied to a given circumstance." Maj. Op. at 19–20. But the presumption in favor of arbitrability applies even where an agreement does not "explicitly apply to a given circumstance," *id.* at 20; rather, it acts a thumb on the scales favoring arbitration whenever an agreement employs language broad enough that it cannot "be said with positive assurance that the arbitration clause is *not* susceptible of an interpretation that covers the asserted dispute," *Holick*, 802 F.3d at 395 (internal quotation marks omitted) (emphasis added). Here, because the broad language of the Arbitration Agreement can reasonably be interpreted to cover such claims, and because Cooper has pointed to no evidence foreclosing such an interpretation, *Coan* should not impact our interpretation of the provision at issue in this case.[2] Accordingly, I would apply the presumption in favor of arbitration and affirm the district court's conclusion.

---

[2] It is also not at all clear that *Coan* would require Cooper to join other parties or bring his claims on a class-wide basis, as the majority seems to suggest. *See* Maj. Op. at 19. While we did explain in *Coan* that plaintiffs who comply with Rule 23 "will likely be proceeding in a 'representative capacity' properly for purposes of section 502(a)(2)," we also explicitly declined to "delineate minimum procedural safeguards that section 502(a)(2) requires in all cases." *Coan*, 457 F.3d at 261. The Supreme Court has emphasized that a class-arbitration waiver will be upheld unless it "eliminates those parties' *right* to pursue their statutory remedy." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (emphasis added). The class-arbitration waiver here would not necessarily eliminate Cooper's *right* to bring a claim under section 502(a)(2). *Coan* might make it procedurally onerous for him to do so – by requiring him to "notify[] . . . other plan participants," *Coan*, 457 F.3d at 261, or to take other measures to ensure that their rights are protected – but the Supreme Court has made clear that practical difficulties involved in bringing individual claims is not a reason for invalidating a class-arbitration waiver, *see Italian Colors*, 570 U.S. at 236.

**II.    Ruane may bind Cooper to the terms of the Arbitration Agreement under the doctrine of equitable estoppel.**

Having concluded that Cooper's claims fall within the scope of the Arbitration Agreement, I would also affirm the district court's determination that Ruane, although not a signatory to that agreement, may nevertheless compel Cooper to arbitrate his claims under the doctrine of equitable estoppel. *See Cooper*, 2017 WL 3524682, at *5–*8.

"Under principles of estoppel, a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where" (1) the non-signatory is seeking to arbitrate issues "intertwined with the agreement that the estopped party has signed" and (2) there is "a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 126–27 (2d Cir. 2010) (internal quotation marks omitted). This Court has recognized that issues are "intertwined" with an arbitration agreement when they arise from the "subject matter" of that agreement, or when those issues are "factually intertwined" with a dispute between the original parties to the agreement. *Id.* at 127–28. And while the type

8

of relationship sufficient to give rise to estoppel is fact-specific, this Court has found such a relationship to exist when a plaintiff alleges that the non-signatory worked in concert with a signatory to the arbitration agreement to harm the plaintiff, *see Denney v. BDO Stillman, L.L.P.*, 412 F.3d 58, 70 (2d Cir. 2005), or when a plaintiff treats the signatory and non-signatory as "as a single unit" for purposes of the litigation, *JLM Indus.*, 387 F.3d at 177 (internal quotation marks omitted).

Cooper's claims against Ruane are sufficiently "intertwined" with the Arbitration Agreement because they plainly relate to the "subject matter" of that agreement. *Ragone*, 595 F.3d at 127. As discussed above, the Arbitration Agreement broadly encompasses "all legal claims arising out of or relating to employment," including "statutory" claims like the ERISA claims Cooper asserts here. App'x at 159. Thus, as the district court recognized, Cooper's claims relate to the express subject matter of the Arbitration Agreement. *See Cooper*, 2017 WL 3524682, at *8; *see also Choctaw Generation Ltd. P'ship v. Am. Home Assurance Co.*, 271 F.3d 403, 407 (2d Cir. 2001) (estopping the signatory where the merits of the dispute the non-signatory sought to arbitrate were "bound up with" the terms of the contract that included the arbitration clause).

Moreover, Cooper's claims against Ruane are "factually intertwined with the dispute" between Cooper and DST. *Ragone*, 595 F.3d at 128. In his complaint, Cooper makes no attempt to distinguish between DST and Ruane, and Cooper's three causes of action are asserted without any differentiation between them. *See* App'x at 42–46. The fact that Cooper has the same dispute with a signatory to the Arbitration Agreement (DST) and a non-signatory (Ruane) makes clear that his claims against Ruane are sufficiently "intertwined" with that agreement. *See Ragone*, 595 F.3d at 128 (estopping the plaintiff where she had the "same dispute" with the non-signatory as her counter-signatory to the contract containing the arbitration clause).

The closer question is whether this case involves the "presence of the further necessary circumstance of a *relationship* between [Cooper] and [Ruane]" that justifies holding Cooper to the terms of the Arbitration Agreement. *Id.* (emphasis added). Ordinarily, one might not consider the relationship between an employee and his employer's investment manager to be a close one. But as the district court recognized, "Ruane was no stranger to Cooper." *Cooper*, 2017 WL 3524682, at *6. To the contrary, Cooper was informed about Ruane's role as exclusive manager of the PSA, *see* App'x at 77, 82, 500–01, and DST notified Cooper that he would be

10

responsible for paying Ruane's fees as of January 1, 2013, *id.* at 458–59. In fact, Cooper testified that, in reviewing his account statements online, he was aware that he was personally paying Ruane his pro rata share of Ruane's investment management fees directly from his PSA account. *Id.* at 410.

Even more compelling is the fact that Cooper has treated Ruane and DST as "as a single unit" throughout this litigation, *JLM Indus.*, 387 F.3d at 177 (internal quotation marks omitted), which this Court has found weighs in favor of applying equitable estoppel. For example, in *Denney v. BDO Seidman, L.L.P.*, we considered whether certain defendants associated with Deutsche Bank could compel the plaintiffs to arbitrate their claims, where the plaintiffs had signed consulting agreements containing arbitration clauses to which the Deutsche Bank defendants were not parties. 412 F.3d at 70. The *Denney* court held that the Deutsche Bank defendants were entitled to compel arbitration under the doctrine of equitable estoppel, explaining:

> Having alleged . . . that the Deutsche Bank and [signatory] defendants acted in concert to defraud plaintiffs, . . . and that defendants' fraud arose in connection with [the signatory defendants'] tax-strategy advice, . . . plaintiffs cannot now escape the consequences of those allegations by arguing that the Deutsche Bank and [signatory] defendants lack the requisite close relationship, or that plaintiffs' claims against the

11

> Deutsche Bank defendants are not connected to Deutsche Bank's relationship with [the signatory defendants].

*Id.* (citing *Grigson v. Creative Artists Agency, L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000) (holding that application of equitable estoppel is warranted when the plaintiff "raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract" (internal quotation marks omitted))).

This same rationale applies to Cooper's claims against Ruane. As the district court recognized, Cooper's "claims against DST and Ruane, as co-fiduciaries, are mutually dependent." *Cooper*, 2017 WL 3524682, at \*7. In his complaint, Cooper alleged that the breaches of fiduciary duty that gave rise to his claims "occurred, at least in part, as a result of severe conflicts of interest between and among the fiduciaries of the DST Plan," which primarily included DST and Ruane. App'x at 14. Cooper further alleged that DST had "a longstanding, symbiotic relationship" with Ruane – which partly explained why DST continued to retain Ruane even after volatility in the PSA, *id.* at 29 – and that DST was "legally responsible for monitoring the investments undertaken by [Ruane] in the PSA," *id.* at 30. In his deposition, Cooper testified that "both DST Systems and Ruane were responsible

12

for investment monitoring" in connection with the PSA. *Id.* at 412.[3] Thus, "[h]aving alleged . . . that [Ruane] and [DST] acted in concert" to breach their fiduciary duties, Cooper "cannot now escape the consequences of those allegations by arguing that [Ruane] and [DST] lack the requisite close relationship" to give rise to equitable estoppel. *Denney*, 412 F.3d at 70. I therefore agree with the district court that Cooper's claims against Ruane are sufficiently "intertwined" with the Arbitration Agreement and that the relationship between Cooper, DST, and Ruane is sufficiently close to allow Ruane to compel Cooper to arbitrate his claims. *See Cooper*, 2017 WL 3524682, at *6, *8.

\*　　　\*　　　\*

Accordingly, because Cooper's ERISA claims fall within the scope of his Arbitration Agreement with DST, and because Ruane may invoke the doctrine of equitable estoppel to compel Cooper to arbitrate those ERISA claims, I would affirm.

---

[3] Indeed, Cooper's original complaint "indiscriminately lumps DST and Ruane together as 'Defendants,'" *Cooper*, 2017 WL 3524682, at *7, and Cooper dismissed DST from the lawsuit only after being reminded by DST's counsel about the Arbitration Agreement, App'x at 430–31. While Cooper contends that he only dismissed DST to "focus his efforts and resources on the defendant that is primarily responsible for the misconduct at issue," *Cooper*, 2017 WL 3524682, at *7, n.1 (internal quotation marks omitted), the timeline of events suggests that this was a tactical dismissal designed to avoid application of the Arbitration Agreement. Courts in this Circuit have considered this type of tactical maneuvering in finding that non-signatories may bind plaintiffs to an agreement through equitable estoppel. *See, e.g., In re A2p SMS Antitrust Litig.*, 972 F. Supp. 2d 465, 478 (S.D.N.Y. 2013); *Bimota SPA v. Rousseau*, 628 F. Supp. 2d 500, 506 (S.D.N.Y. 2009).